IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

HOMEQ SERVICING CORPORATION *

    Appellant, *

vs. *

                           CASE NO. 4:06-CV-83 (CDL)

MICHAEL J. HAUF and LINDA M. *
HAUF,
                       *

    Appellees. *

## O R D E R

HomEq Servicing Corporation ("HomEq") appeals the bankruptcy court's reopening of Michael and Linda Hauf's ("the Haufs" or "debtors") Chapter 13 bankruptcy proceeding to permit the trustee to pursue and administer a previously undisclosed pre-petition asset.[1] The asset consists of the debtors' cause of action against HomEq, which is asserted in a pending lawsuit captioned *Hauf v. HomEq Servicing Corp.,* No. 4:05-CV-109 (M.D. Ga.). For the following reasons, this Court affirms the bankruptcy court.

## STANDARD OF REVIEW

This Court reviews the bankruptcy court's findings of law *de novo* and the bankruptcy court's findings of fact for clear error. Fed. R. Bankr. P. 8013; *Unsecured Creditors Comm. v. Webb & Daniel,* 204 B.R. 830, 832 (M.D. Ga. 1997).

---

[1] HomEq appealed two separate orders of the bankruptcy court, an order reopening the Chapter 13 proceedings and an order vesting the cause of action in the trustee to pursue as an asset of the bankruptcy estate. This Court consolidated the two appeals.

BACKGROUND

On July 25, 1996, the Haufs obtained a loan (hereinafter "Loan") from The Money Store for $134,000, using their house as collateral. The monthly payments varied with the current interest rate. By December 8, 1998, the Haufs were over $12,000 in arrears on their mortgage. Instead of foreclosing on the home, The Money Store entered into a Forbearance Agreement with the Haufs. Under the Agreement, the Haufs made a deposit of $6,367.80 up front, and agreed to pay the balance in twenty-four monthly installments of $265.33. During the two year Agreement, the Haufs also agreed to make their normal monthly mortgage payments. In November 2000, The Money Store was acquired by HomEq. The Haufs claim that they made all payments as required under the Forbearance Agreement.

On December 16, 2000, the Haufs made their final payment under the Forbearance Agreement. Attached to this final payment was a letter confirming the satisfaction of the Agreement. Thereafter, the Haufs sent their January 2001 Loan payment to HomEq. HomEq returned the January 2001 payment with a letter explaining that the Haufs were over $5,000 in arrears on their mortgage payments. HomEq admits that (1) this was an error based on several "erroneous charges" the Haufs had been assessed during the Forbearance Agreement, and (2) that the Loan was current as of December 2000. Since HomEq did not realize that the charges were in error, HomEq failed to reconcile its computer system to bring the Loan current at the completion of the Forbearance Agreement. Additionally, based on these erroneous charges, HomEq's servicing system showed the Loan in default in January 2001.

In February 2001, the Haufs mailed their February mortgage payment, which was retained by HomEq. On February 27, 2001, the Haufs

2

received a letter from HomEq indicating that the Loan had been in default since November 1, 2000, and that the Haufs must pay $6,757.87 or HomEq would initiate foreclosure proceedings. In March, the Haufs submitted their March payment to HomEq and attached the previously rejected January payment. HomEq kept both of these payments. On March 8, 2001, the Haufs' attorney, Richard Flowers, sent HomEq a letter explaining that the Haufs should not be in default.

HomEq subsequently returned the Haufs' April 2001 payment. On April 16, 2001, the Haufs received another letter from HomEq claiming they were in default and that HomEq could foreclose on their house.[2] On April 23, 2001, the Haufs received a letter from HomEq notifying them that a foreclosure ad was running in the paper and that the foreclosure would occur on June 5, 2001. In response, the Haufs sent a letter dated April 24, 2001, to Morris, Schneider & Prior, LLC, HomEq's attorneys in charge of the foreclosure, explaining that the Loan was not in default. Attached to this letter was (1) the Forbearance Agreement, (2) a copy of the forbearance payment schedule, (3) copies of each certified check (representing the mortgage payment and forbearance payment) paid to HomEq during the Forbearance Agreement, (4) the letter sent to HomEq in December 2000 finalizing the Forbearance Agreement, (5) copies of the letters sent by HomEq between December 2000 and April 2001 claiming that the Loan was in default, and (6) copies of the letters sent by the Haufs and Mr. Flowers to HomEq trying to determine why the Loan was considered in default. Thereafter, HomEq agreed to suspend the June 5 foreclosure.

---

[2]HomEq admits that it sent the foreclosure letters, but claims that these letters were automatically generated by the servicing system.

3

From May until September, 2001, Mr. Flowers and the Haufs continued to contact Morris, Schneider & Prior and HomEq to determine why the Loan was considered in default. Also during this time, HomEq refused to accept mortgage payments from the Haufs. In September 2001, HomEq rescheduled the foreclosure for October 2, 2001. On October 1, 2001, in order to stop the foreclosure proceedings, the Haufs filed for protection under Chapter 13 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Georgia.

A. <u>2001 Bankruptcy</u>

On October 18, 2001, the Haufs filed their Chapter 13 Statement of Financial Affairs. In Schedule B—the Personal Property Schedule—the Haufs failed to state that they had a potential claim against HomEq for wrongful foreclosure or breach of contract. On November 2, 2001, HomEq filed a proof of claim with the bankruptcy court alleging that the Haufs were $15,626.96 in arrears on the Loan. On November 20, HomEq amended its proof of claim to $16,894.45. On January 14, 2002, the Haufs' Chapter 13 Plan was confirmed.

The Haufs filed an objection to HomEq's proof of claim on October 24, 2002. In this objection, the Haufs explained that they fulfilled their obligations under the Forbearance Agreement, that they were not in default in January 2001, and that HomEq failed to correct its error. On January 15, 2003, the bankruptcy court issued an order disallowing HomEq's proof of claim, directing HomEq to recompute the Haufs' arrearage amount, and requiring HomEq to explain how it arrived at the new arrearage amount. HomEq complied with this order on March 13, 2003, and submitted a payment history for the Loan which showed the May 1999 through January 2000 payments as missing. HomEq also moved for reconsideration of the January 15 Order disallowing the

4

proof of claim. On December 5, 2003, the bankruptcy court entered an Order allowing the proof of claim but reduced the amount to $10,179.54. The Haufs admit that they owed HomEq $10,179.54 because that was the amount of mortgage payments that HomEq refused during 2001 before the Chapter 13 case was filed.

On November 24, 2004, the Haufs received a letter from the bankruptcy trustee explaining that their payments were complete under the bankruptcy plan. Therefore, the Haufs were directed to make their regular payments to HomEq starting January 1, 2005. The bankruptcy court entered an order discharging the Haufs as debtors on March 1, 2005, and the Chapter 13 bankruptcy case was closed on March 29, 2005.

B. <u>2005 Bankruptcy</u>

From January to May 2005, the Haufs made their mortgage payments, and these payments were accepted by HomEq. On May 18, 2005, the Haufs received a letter rejecting their June 2005 payment and explaining that the Loan was again in default. HomEq claims that this was the result of a failure to adjust the account balance after the proof of claim was reduced by the bankruptcy court. This error in the computerized servicing system resulted in the initiation of automatic foreclosure proceedings against the Haufs. The Haufs sent their June payment again with a letter explaining that they were not in default. HomEq scheduled a foreclosure for July 5, 2005 and rejected the June payment a second time. On June 30, 2005, the Haufs filed their second Chapter 13 Bankruptcy case in order to stop the foreclosure.

### C. Wrongful Foreclosure Action

On September 16, 2005, the Haufs moved to amend their 2005 bankruptcy schedule to include a possible cause of action against HomEq. The schedule was amended and on September 27, 2005, the Haufs filed *Hauf v. HomEq Servicing Corp.*, No. 4:05-CV-109 (hereinafter "wrongful foreclosure action"), in this Court alleging wrongful foreclosure and breach of contract. On October 25, 2005, HomEq answered the civil action and claimed that the Haufs' claims were partially barred by judicial estoppel based upon their failure to list the cause of action in the 2001 bankruptcy schedules. The Haufs then moved to reopen the 2001 bankruptcy case on March 24, 2006, so that they could amend their schedule to include the cause of action against HomEq. Additionally, on June 2, 2006, the Haufs moved to vest their claim against HomEq in the bankruptcy trustee. After a hearing on the motions, on June 14, 2006, the bankruptcy court ordered that the 2001 bankruptcy case be reopened and that the Chapter 13 trustee be vested with "any claim of the [Haufs'] against HomEq Servicing Corp. that existed at the time of the filing of [the 2001 bankruptcy]." (Vesting Order 2, June 14, 2006.)

On June 23, 2006, the Haufs amended their 2001 bankruptcy schedule to include a cause of action against HomEq. On July 20, 2006, HomEq appealed the bankruptcy court's June 14, 2006 orders reopening the 2001 bankruptcy and vesting the Haufs' claim against HomEq in the bankruptcy trustee. This Court consolidated the appeals of these orders and addresses both in this Order.

6

DISCUSSION

The issue presently before the Court is whether the bankruptcy court erred in reopening the 2001 Chapter 13 proceedings to allow the trustee to pursue and administer the previously undisclosed pre-petition cause of action against HomEq.

Under 11 U.S.C. § 350(b), a bankruptcy court may reopen a closed bankruptcy case in order to "administer assets." *See also* Fed. R. Bankr. P. 5010 ("A case may be reopened on a motion of the debtor or other party in interest pursuant to § 350(b) of the Code.") The ability to reopen is within the discretion of the bankruptcy court. *Apex Oil Co. v. Sparks* (*In re Apex Oil Co.*), 406 F.3d 538, 543 (8th Cir. 2005); *Citizens Bank & Trust Co. v. Case* (*In re Case*), 937 F.2d 1014, 1018 (5th Cir. 1991); *Price v. Haker* (*In re Haker*), 411 F.2d 568, 569 (5th Cir. 1969). "This discretion depends upon the circumstances of the individual case and accords with the equitable nature of all bankruptcy court proceedings." *Case*, 937 F.2d at 1018; *see also Apex Oil*, 406 F.3d at 542. Consequently, this Court reviews the bankruptcy court's granting of the motion to reopen for abuse of discretion, *Haker*, 411 F.2d at 569, and cannot reverse the ruling unless "the bankruptcy court committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *Apex Oil*, 406 F.3d at 541.

In this case the bankruptcy court found that the debtors, in failing to disclose the cause of action initially, did not intend to defraud the court, did not violate their oath as to the schedules, and did not improperly conceal the asset from their creditors and the trustee. (Bankr. Hr'g Tr. 75:3-7, June 13, 2006.) The court therefore concluded that since the debtors consented to the Chapter

7

13 proceeding being reopened to allow the trustee to pursue and administer the previously undisclosed claim, it was appropriate to reopen the proceedings and authorize the trustee to administer the asset.

HomEq contends that the bankruptcy court erred because the only way for the asset to be administered is to modify the previous plan which cannot be done after the case has been closed.[3] The bankruptcy court explained its rationale as follows:

> At first blush it seems like a good argument that a plan . . . may not be modified after it has paid out. That assumes, it seems to me, what is probably not the case, that a plan must be modified for the trustee to distribute money that has come into the trustee's hands with consent of the debtors for the purpose of making distributions to unsecured creditors who have filed claims in the case. Now, if you wanted to treat creditors more adversely than they had been treated in a plan, clearly you've got to have a modification. If you wanted to deal with the debtors' property or property of the estate, which may or may not have vested in the debtors, in a matter that might be contrary to the debtors' personal interest and without their consent, you would have to have a modification.
>
> . . .
>
> [But,] it seems to me that if debtors come into money, from an inheritance, from winning the lottery, from a cause of action, from a gift, from whatever source, and the debtors consent to that money being paid through their Chapter 13 plan to unsecured creditors, that doesn't require a modification. The trustee can take those funds and pay them on a pro rata basis up to a hundred percent to the unsecured creditors. So the fact that the plan can't be modified, it seems to me, is not a reason to say that the trustee cannot administer the asset.

(Bankr. Hr'g Tr. 77:14-78:20, June 13, 2006.)

The Court finds the bankruptcy court's rationale persuasive and rejects HomEq's argument that the bankruptcy court has no authority

---

[3]HomEq relies upon 11 U.S.C. § 1329 for the proposition that the only way for this asset to have been administered was to have modified the plan prior to the completion of the plan and the closing of the bankruptcy case.

8

to administer this single cause of action without modifying the previously completed plan. Bankruptcy courts, as courts of equity, have the broad authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Code. 11 U.S.C. § 105(a); *United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990); *Gurney v. Ariz. Dep't of Revenue (in re Gurney)*, 192 B.R. 529, 537 (B.A.P. 9th Cir. 1996). These broad equitable powers, of course, are not unlimited. "Section 105(a) may be exercised only in a manner not inconsistent with the provisions of the Code." *Gurney*, 192 B.R. at 537. Therefore, the question becomes whether the bankruptcy court's actions are inconsistent with other provisions of the Code, specifically 11 U.S.C. § 1327(b) and § 1329(a), which HomEq argues prohibit the actions taken in this case by the bankruptcy court.

Section 1329(a) purports to limit the modification of a Chapter 13 plan after completion of payments under the confirmed plan.[4] In this case, however, the bankruptcy court did not authorize and does not contemplate modifying the previously completed plan. To the contrary, the bankruptcy court expressly concluded that the asset in question could be administered without modifying the plan. Thus, § 1329(a) is not implicated since there will be no modification of the plan. The Court finds no legitimate basis for overturning this exercise of discretion by the bankruptcy court.

HomEq also points to § 1327(b) in support of its contention that the bankruptcy court had no authority to authorize the trustee to

---

[4]The Code section actually states in relevant part: "At any time after confirmation of the plan but before the completion of payments under such plan, the plan may be modified . . . ." 11 U.S.C. § 1329(a).

9

pursue the claim. Section 1327(b) generally provides that upon confirmation of the plan any claims, including undisclosed ones, vest in the debtor.[5] However, this argument ignores the fact that the debtors in this case have voluntarily consented to the assignment of the claim to the trustee for administration for the benefit of the creditors.[6] Under the unique circumstances of this case, the Court finds that the bankruptcy court's decision to authorize the trustee to pursue the claim does not run afoul of § 1327(b).

Based on the foregoing, the Court finds that the bankruptcy court did not abuse its discretion under § 105(a) and § 350(b) in reopening the case to allow the trustee to pursue and administer the asset.

## CONCLUSION

The bankruptcy court's orders reopening the case to permit the Chapter 13 trustee to pursue and administer the cause of action against HomEq are affirmed.[7]

---

[5] The Code section states: "Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor." 11 U.S.C. § 1327(b).

[6] HomEq's argument also ignores the fact that when the case is reopened, it is obviously in a different posture than the situation where a trustee may attempt to assert a claim without reopening the case. Upon reopening a closed case, the bankruptcy court has the authority under certain circumstances to divest the debtor of an asset that the debtor consents to having administered for the benefit of the creditors under the plan. *See In Re Woods,* 173 F.3d 770, 776-81 (10th Cir. 1999) (the Tenth Circuit held in the analogous Chapter 11 context that upon the reopening of the bankruptcy proceeding the trustee could reclaim a scheduled, and consequently abandoned, asset and administer it even though it arguably had vested in the debtor upon the previous completion of the plan).

[7] The Court makes no finding in this appeal regarding judicial estoppel, except to the extent that the Court affirms the bankruptcy court's conclusion that the nature of the non-disclosure of the cause of action in this case does not prevent the reopening of the Chapter 13 proceeding to allow the trustee to pursue and administer the claim. This finding does not preclude HomEq from raising judicial estoppel as a defense to the civil action.

10

IT IS SO ORDERED, this 23rd day of January, 2007.

                                          <u>S/Clay D. Land</u>
                                              CLAY D. LAND
                                      UNITED STATES DISTRICT JUDGE